UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | Case No. 2:19-cr-00009-APG-NJK |
| vs. | ORDER AND |
| RAYMOND LLOYD GROGINS, | REPORT AND RECOMMENDATION |
| Defendant. | (Docket No. 22) |

This matter was referred to the undersigned Magistrate Judge on defendant Raymond Lloyd Grogins' motion to suppress statements and evidence. Docket No. 22. The Court has considered Defendant's motion and exhibit, the United States' response and exhibit, Defendant's reply, and the evidence and arguments presented at an evidentiary hearing held before the Court. Docket Nos. 22, 23, 24, 25, 26, 42.

**I.   BACKGROUND**

**A.  Testimony of Sergeant Benjamins**

On October 8, 2018, at approximately 11:55 a.m., Henderson Police Department Sergeant Felicia Benjamins responded to a priority dispatch call involving a gun at a residence in Henderson, Nevada, due to the nature of the call. Docket No. 44 at 7. Sergeant Benjamins was not one of the first responding officers and responded as a supervisor because it was a gun call. *Id*. at 12-13. When Sergeant Benjamins arrived at the location, she observed that three individuals had been removed from the trailer and were on the sidewalk in handcuffs with officers watching over them. *Id*. at 13-14, 15. Sergeant Benjamins observed Defendant sitting on the curb in handcuffs

accompanied by Henderson Police Officer Smith. *Id*. at 8, 14, 15. Since Defendant was in handcuffs, it was likely that he had been patted down and Sergeant Benjamins was not informed whether any weapons were found on Defendant. *Id*. at 15. Sergeant Benjamins observed additional officers down the street toward the residence. *Id*. at 7, 23. Sergeant Benjamins' role was to observe and try to stabilize the situation. *Id*. at 7, 20. Sergeant Benjamins was also involved in investigating the incident. *Id*. at 20.

Sergeant Benjamins approached Defendant, who was sitting on the curb in handcuffs engaged in "a dialogue" with Officer Smith. *Id*. at 8. Sergeant Benjamins told Defendant that he was not under arrest and was in handcuffs for his safety, officer safety, and the safety of the community since the instant dispatch call was a gun call and officers were trying to make the scene safe and decipher what had occurred. *Id*. Sergeant Benjamins told Defendant he was not in custody at that time. *Id*. at 10, 11. Defendant was not free to leave during this time, however. *Id*. at 22. During the time that Sergeant Benjamins was present, she observed Officer Smith speaking to Defendant, though she did not know if it was just dialogue or interrogation; however, she never heard Officer Smith give *Miranda* warnings to Defendant. *Id*. at 16-17.

Since the dispatch call stated that a white truck was involved in the incident, Sergeant Benjamins asked Defendant if the white truck parked in front of the trailer belonged to him. *Id*. at 9, 17. Defendant responded that it was not his truck. *Id*. at 19. Sergeant Benjamins also asked Defendant whose gun had been part of the incident and Defendant responded that the gun belonged to his friend. *Id*. at 17-18, 19. Sergeant Benjamins asked Defendant if he knew where the gun was and if the gun came into play during the incident. *Id*. at 19, 24-25. Defendant said that the firearm was in the back of the truck and that it had been in a bag the entire time. *Id*. at 19-20, 24-25. Sergeant Benjamins also asked Defendant if it was all right with him if she looked in the truck

2

because he had already said the firearm was there. *Id*. at 9. Sergeant Benjamins did not advise Defendant of his *Miranda* rights prior to asking him questions. *Id*. at 19. Sergeant Benjamins asked about the firearm for safety so it could be secured, though Defendant and the other two possible suspects had already been secured at that time. *Id*. at 25-26.

Sergeant Benjamins walked over to the truck and saw that the gun was in the bed of the truck. *Id*. at 19-20. Defendant was arrested for possessing brass knuckles that day but was not arrested for any charge relating to the gun on October 8, 2018. *Id*. at 21-22.

### B. Testimony of Officer Smith

On October 8, 2018, Henderson Police Department Police Officer Michael Smith was dispatched to a family disturbance in Henderson, Nevada that he was told involved two males arguing with each other and one of them brandishing a shotgun. *Id*. at 27-28, 39.[1] The dispatch came about as a result of a 911 call reporting the disturbance. *Id*. at 37. Due to the nature of the call, approximately six officers responded to the scene. *Id*. at 28. The call stated that the incident included two white males and a white pickup truck. *Id*. at 29. The call described the male with a firearm as a white male wearing a white hat and shirt; however, Defendant's hat was grey and his shirt was not white. *Id*. at 40, 42.

When Officer Smith arrived on the scene, he parked at the entrance to the trailer park and proceed, along with other officers, on foot toward the residence. *Id*. at 29. Outside of the residence, Officer Smith observed the pickup truck, as well as two males and a female behind a chain link fence. *Id*. As they approached, the officers' guns were drawn due to the nature of the

---

[1] On direct examination, Officer Smith testified that the call stated two brothers were involved in the incident. Docket No. 44 at 27-28. After refreshing his recollection with his report on cross examination, however, Officer Smith testified that the call stated two males, not brothers, were involved in the incident. *Id*. at 39.

call. *Id*. at 29, 43-44. Officer Smith issued commands to the three people to put their hands up and walk toward him outside of the fence; all three complied with the commands. *Id*. at 29, 44. As Defendant approached Officer Smith, while Officer Smith's weapon was pointed in his direction, the officer told him to lift his shirt up and turn in a circle to determine that Defendant had no weapons in his waistband, then to walk closer, turn around, and get on his knees. *Id*. at 29-30, 45. Officer Smith saw no weapons on Defendant at that time. *Id*. at 45-46. When Defendant reached Officer Smith, he immediately "took [Defendant] into custody" and put handcuffs on him. *Id*. at 30, 46.

After assisting in taking the other two people – one of whom was Defendant's brother - into custody, Officer Smith returned to Defendant. *Id*. at 30-31, 48. At this point, all three potential suspects were in handcuffs and secure, and separated from each other. *Id*. at 48-49, 51. Officer Smith, who was standing while Defendant sat on the curb, first asked Defendant why he thought police were present at the scene, not where the shotgun was located. *Id*. at 51-52, 74, 80. Next, Officer Smith asked Defendant if anyone else was in the trailer, and Defendant said no. *Id*. at 52. Officer Smith then asked Defendant where the shotgun was. *Id*. Officer Smith asked Defendant where the shotgun was six times before Defendant answered the question. *Id*. at 53. When Defendant told the officer where the shotgun was and gave him permission to look for the gun in the back of the truck, the officer told other officers, then continued questioning Defendant. *Id*. at 34, 54-55.

After the shotgun had been secured, Officer Smith continued questioning Defendant - he asked Defendant his name, date of birth, social security number, where he lived, and what the fight was about. *Id*. at 31, 55. Defendant responded to these questions and never refused to answer them. *Id*. at 31, 51. Defendant told Officer Smith that he and his brother got into an argument that

4

morning and his brother wanted him to leave the house. Defendant did not want to walk down Sunset or Boulder Highway with his backpack and shotgun, so he put the shotgun into his truck before the officers arrived. *Id*. at 32. Defendant further told Officer Smith that the shotgun belonged to his friend Showboat, who gave it to him to hold; that he never pointed the gun at anyone; that the gun was not involved in the incident; and that he put it in the back of the pickup truck. *Id*.

During this period, Officer Smith considered Defendant detained but not under arrest. *Id*. at 33, 75. According to Officer Smith, family disturbances are inherently dangerous and adding a firearm "brings it to a whole different level." *Id*. at 33. When Officer Smith first contacted Defendant, he patted him down for weapons, discovered brass knuckles in his pocket, and removed them so that no one on the scene would have access to them. *Id*. at 33, 46. Therefore, for his safety and the safety of the community, Officer Smith did not feel comfortable removing Defendant's handcuffs. *Id*. at 33.

While questioning Defendant, Officer Smith further asked if he had ever been arrested before and Defendant responded that he had been arrested for assault with a deadly weapon in California. *Id*. at 34, 56. Officer Smith also asked Defendant how long he had lived in Las Vegas and whether he had registered as a felon in Las Vegas. *Id*. at 57. Throughout this questioning, Officer Smith never read Defendant his *Miranda* rights. *Id*. at 55-56, 57. Defendant remained in handcuffs and was not free to leave. *Id*. at 56.

Officer Smith was able to run a local records check on Defendant, but the national database was not working that day, so he could not determine whether Defendant had a prior felony conviction. *Id*. at 34-35. Nonetheless, Officer Smith arrested Defendant for possessing brass knuckles and for felon in possession of a firearm. *Id*. at 35. Officer Smith had Defendant stand

5

up, conducted a complete search of Defendant, placed Defendant in the back of his patrol car, and read Defendant his rights pursuant to *Miranda*. *Id*. at 35, 57-58. Defendant said that he understood his rights and continued to talk to the officer. *Id*. at 35, 59. The *Miranda* rights were given approximately 30 minutes after the shotgun was seized. *Id*. at 58-59. All of the information that Officer Smith had to arrest Defendant for felon in possession of a firearm – that he was a convicted felon who hadn't registered in Nevada and possessed a shotgun that day – came from Defendant's pre-*Mirandized* statements. *Id*. at 60. After Officer Smith advised Defendant of his *Miranda* rights, he asked him questions to elicit the same information that he had elicited from Defendant prior to giving him his *Miranda* rights. *Id*. at 61.

Officer Smith transported Defendant to jail, where he discovered that the national database was still down and he could not confirm Defendant's prior felony, so he transported Defendant back to his residence and issued a citation for possession of brass knuckles. *Id*. at 36, 62. When the database came back up and Officer Smith confirmed Defendant's prior felony, he drafted an affidavit for a search warrant to arrest Defendant for convicted felon failing to register and prohibited person in possession of a firearm. *Id*. at 63. Officer Smith never considered applying for a search warrant because Defendant told him where the firearm was located and gave him consent to go into the truck and recover it. *Id*.

**II.   ANALYSIS**

      **A.   Credibility of Witnesses**

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere

platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, while the Court finds herein that the officers made mistakes on the scene of the incident that impact the motion to suppress, the Court finds that both Sergeant Benjamins and Officer Smith testified credibly and, in fact, were completely open and honest throughout the evidentiary hearing.

### B. Motion to Suppress

Defendant asks the Court to suppress his statements and the firearm recovered from the truck. *See* Docket No. 22. In support of his request, Defendant submits that the officers engaged in an illegal two-step protocol in violation of his *Miranda* rights, that his statements were involuntary under the totality of the circumstances and obtained in violation of the Fifth Amendment, and that the shotgun is fruit of the poisonous tree. *Id*. at 5-6. Defendant submits that officers were required to advise him of his *Miranda* rights prior to his initial statements, as they are the result of custodial interrogation. *Id*. at 6-9. Defendant further submits that the midstream

*Miranda* rights fail to cure this deficiency and, therefore, asks the Court to suppress all statements made after the midstream *Miranda* rights. *Id*. at 10-12.

Defendant additionally submits that his statements were involuntary because he was surrounded by officers who pointed guns at him, patted down and handcuffed, placed on a curb, and interrogated by an officer standing over him without being informed of his right to remain silent or his right to have counsel present. *Id*. at 14. Defendant submits that, when he did not initially provide an answer to Officer Smith's question regarding the location of the shotgun, Officer Smith repeated the question numerous times until he responded, indicating that compliance was mandatory. *Id*. Further, Defendant submits that Officer Smith's tone, positioning over Defendant and line of questioning was coercive and that Sergeant Benjamins' arrival and similar line of questioning was also coercive. *Id*. Under the circumstances of the interrogation, Defendant submits, his will was overborne and he responded to the questions in a manner that incriminated himself. *Id*. at 14-15.

Finally, Defendant submits that the shotgun is fruit of the poisonous tree. *Id*. at 15. Defendant submits that officers were able to locate the shotgun and charge him with possessing due to his involuntary statements. *Id*. Therefore, Defendant asks the Court to suppress his statements and the shotgun. *Id*. at 16.

In response, the United States submits that reasonable suspicion existed to detain Defendant. Docket No. 24 at 4-7. Specifically, the United States submits that the circumstances of the call allowed officers to detain Defendant until they could determine if the scene was safe. *Id*. at 5-6. The United States next submits that Defendant "spontaneously uttered several

statements" while initially detained without officers questioning him.[2] *Id*. at 7, 9. The United States further submits that, although Officer Smith became "stern" when Defendant initially did not respond to his questions about the gun, he was otherwise "pleasant and non-demanding." *Id*. at 8.

The United States submits that Defendant's statement was voluntary, as he spoke spontaneously to Officer Smith and later waived his *Miranda* rights. *Id*. The United States seems to argue, with no authority, that Defendant did not need to be Mirandized, as he had been arrested before and, therefore, "had knowledge of the system." *Id*. at 9. The United States analogizes the instant situation to one in which a suspect was found to have validly waived *Miranda* rights during custodial interrogation. *Id*. at 8-9. Finally, in response to Defendant's argument regarding the shotgun, the United States solely states, "Defendant's argument that the gun must be suppressed is not supported by case law and must be dismissed." *Id*. at 5. The United States cites to no caselaw at all and never returns to this topic. *See* Docket No. 24.

In reply, Defendant submits that he was clearly subjected to custodial interrogation. Docket No. 26 at 2-5. Defendant submits that the burden falls on the United States to demonstrate that his statement was voluntary and that the United States has failed to carry that burden. *Id*. at 5. Defendant further submits that the post-*Miranda* statements are a result of an illegal two-step interrogation protocol in violation of his rights. Id. at 6-9. Additionally, Defendant submits that his statements were involuntary. *Id*. at 9. Finally, Defendant submits that the seizure of the

---

[2] The Court is troubled by this and other representations made by the Assistant United States Attorney assigned to the instant case. This representation is clearly not true, as demonstrated both by the bodycam of Officer Smith (which the AUSA had in her possession prior to writing her response) and by the credible testimony of both Sergeant Benjamins and Officer Smith.

shotgun constitutes fruit of the poisonous tree. *Id*. Defendant, therefore, asks the Court to suppress his statements and the shotgun. *Id*. at 10.

### 1. Pre-*Miranda* Statements

Law enforcement personnel who wish to question individuals in their custody must first afford them certain procedural rights. The most salient of these rights are the so-called "*Miranda* warnings" - prior to questioning, an officer must tell a suspect "that he has the right to remain silent and also the right to the presence of an attorney." *Robertson v. Pichon*, 849 F.3d 1173, 1183 (9th Cir. 2017) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). The *Miranda* warnings are designed to secure a person's Fifth Amendment privilege against compelled self-incrimination. The Supreme Court has reasoned that the privilege is protected when a person is adequately and effectively advised of his or her rights. *See id*.; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

The "touchstone" for *Miranda* warnings is whether the suspect was in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981)). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced

statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Williams*, 435 F.3d at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Id*. at 1152. In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

"[T]he term 'interrogation' under *Miranda* refers ... to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Williams*, 842 F.3d 1143, 1146-1147 (9th Cir. 2016) (internal citation omitted). Routine gathering of "background biological information, such as identity, age, and address, usually does not constitute interrogation." *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006). *See also Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (answers to questions regarding defendant's name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of Miranda warnings); *United States v. Zapien*, 861 F.3d 971, 974-975 (9th Cir. 2017). Pre-*Miranda* questions about a person's identity "are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." *Id*. at 1133.

The determination of whether a defendant is in custody for purposes of the requirement to provide *Miranda* warnings is determined by examining the objective circumstances of the interrogation. *Stansbury*, 511 U.S. at 323. Because the Court is directed to examine the objective circumstances of the interrogation, the subjective views of either the suspect or the interrogating officer is not relevant to the determination of whether the defendant was in custody. *Id*. *See also*

*United States v. Leasure*, 122 F.3d 837, 840 (9th Cir. 1997). The Ninth Circuit has identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

Here, the Court finds that, under the *Kim* factors, Defendant was clearly in custody when he was seated on the curb. Defendant was summoned from his location by police officers pointing guns at him and yelling commands. When he complied with the commands and approached the officers with his hands in the air, he was told to pull his shirt up, turn in a circle, turn his back to officers, and get on his knees. Defendant was then patted down and handcuffed. Next, Defendant was confronted with evidence of guilt – specifically, he was asked repeatedly by more than one officer where the gun was, to whom it belonged, and whether he had possessed it. Further, he was asked if he had a prior conviction and whether he had registered in Nevada. Third, the physical surroundings of the interrogation were that Defendant was handcuffed and seated on a curb while an armed officer – and, for a time, more than one - stood above him interrogating him. Fourth, Defendant was detained for approximately 30 minutes. Finally, Defendant was physically restrained while detained. The Court finds that a reasonable person, under these circumstances, would not feel free to leave and, therefore, Defendant was in custody.

The Court further finds that Officer Smith's questions to Defendant while he was handcuffed on the curb extended far beyond background biographical information and constituted interrogation. Among other questions, Officer Smith asked Defendant six times where the shotgun was; he asked whose shotgun it was; he asked whether Defendant possessed the shotgun; he asked for permission to recover the shotgun; he asked Defendant if he had been convicted of a felony;

and he asked Defendant if he had registered in Nevada as a felon. Additionally, Sergeant Benjamins asked Defendant if the white truck parked in front of the trailer belonged to him; whose gun had been part of the incident; whether he knew where the gun was; if the gun came into play during the incident; and if it was all right with him if she looked in the truck.

Based on the totality of the circumstances, the Court finds that Defendant was subjected to custodial interrogation. Defendant was not advised of his *Miranda* rights prior to this custodial interrogation.³ Therefore, the Court finds that Defendant's statements were improperly obtained. *Williams*, 435 F.3d at 1152 (if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him).⁴

### 2. Post-*Miranda* Statements

"[W]here law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his rights, the trial court

---

³ Though not argued in briefing, the United States submitted at the evidentiary hearing that the questions fell under the "public safety" exception to *Miranda* warnings. *See New York v. Quarles*, 467 U.S. 649 (1984). This exception covers situations in which "there was an objectively reasonable need to protect the police or the public from any immediate danger." Williams, 842 F.3d at 1149 (quoting *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994)). The exception allows an officer to ask "narrowly tailored question[s that constitute] a reasonable attempt by [the] police officer to insure his personal safety." *Carrillo*, 16 F.3d at 1050. The facts, as determined by the officers' testimony in the evidentiary hearing, clearly establish that the pre-*Miranda* questions asked were not narrowly tailored to personal safety; therefore, this argument fails.

⁴ "[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz*, 162 Fed.Appx. 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir.2002)) (quotations omitted). Under the totality of the circumstances, the Court finds that the United States has failed to demonstrate that Defendant's statements were voluntary.

should suppress the confession." *Williams*, 435 F.3d at 1158 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)) (emphasis removed). Specifically, "[a] two-step interrogation involves eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of *Miranda* rights, and then eliciting a repeated confession." *United States v. Narvaez–Gomez*, 489 F.3d 970, 973–74 (9th Cir. 2007).

In *Seibert*, the Court found that midstream *Miranda* warnings have inherent issues. For example, "telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." *Seibert*, 542 U.S. at 613. Thus, the Court found, "when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id*. at 613-614 (citing *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). The Court further found that "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id*. at 614.

The *Siebert* Court instructs that a series of facts are relevant in determining whether midstream *Miranda* warnings remedy the failure to warn prior to a first confession: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*. at 615.

14

Here, the first round of interrogation consisted of complete and detailed questions and answers. Officer Smith and Sergeant Benjamins asked Defendant numerous questions that covered all aspects of the crimes with which Defendant was charged, including the location of the gun, whether Defendant possessed it, whether Defendant owned it, whether it was "in play" during the argument, whether Defendant has a prior conviction, and whether Defendant registered in Nevada. In addition, the second interrogation consisted solely of Officer Smith re-asking the same questions he and Sergeant Benjamins asked during the first interrogation. Therefore, police continuity occurred and the two statements clearly overlapped. Further, the Court finds there was no change of scenery between the first and second interrogations. Rather, the second interrogation occurred at the same area as the first – only inside Officer Smith's car rather than sitting on the curb outside – within 30 minutes of the first interrogation. Finally, the second interrogation appears to be a continuation of the first. Therefore, under *Siebert*, the *Miranda* warnings given midstream do not cure the lack of *Miranda* warnings prior to Defendant's initial custodial interrogation, and the Court finds that the statements in the second interrogation were improperly obtained.

### 3. Seizure of Firearm

The Court has already found that Defendant's statements were improperly obtained and the officers found the gun based on Defendant's statement regarding its location and permission to search the truck. The United States has failed to raise any argument as to how the gun may fall within any exceptions to the exclusionary rule.[5] "[J]udges [are not required] to anticipate and join

---

[5] The United States, in fact, failed to make any argument regarding the requested suppression of the gun or cite to any authority whatsoever. The United States' entire discussion regarding the requested suppression of the gun amounts to one sentence. *See* Docket No. 24 at 5.

15

arguments that are never raised by the parties. *See United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir. 1995). Instead courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision." *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010). Therefore, the Court finds that the United States waived any arguments regarding the inapplicability of the exclusionary rule. *See Kiessling v. Rader*, 2018 WL 1401972, at *3 (D. Nev. Mar. 20, 2018) ("The appropriate time to raise these additional arguments has passed as Defendants should have raised these arguments before Judge Koppe"); *see also Kor Media Grp., LLC v. Green*, 294 F.R.D. 579, 582 n.3 (D. Nev. 2013) (courts only consider meaningfully-developed arguments).

As the United States has presented no meaningful argument in response to Defendant's request for suppression of the gun, the Court finds that the gun was improperly seized as fruit of the poisonous tree. *See United States v. Rose*, 189 F.Supp.3d 528, 544-546 (D.V.I. 2016).

### III. RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 22, be **GRANTED**.

DATED: November 1, 2019.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). A party who objects to this report and

recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).